IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

CIVIL ACTION 05-30093-MAP

| | |
|---|---|
| COLLEEN A. CLOUTIER and DONALD L. CLOUTIER, <br>     Plaintiffs <br><br> vs. <br><br> TRUSTEES OF MILLBANK PLACE CONDOMINIUM <br> TRUST, HAMPSHIRE PROPERTY MANAGEMENT GROUP <br> INC., and MARCUS, ERRICO, EMMER & BROOKS, P.C., <br>     Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANTS' MOTION TO DISMISS
## COUNTS I, III, IV, V, VI AND VIII OF PLAINTIFFS' COMPLAINT

Now come the Trustees of Millbank Place Condominium Trust (hereinafter

referred to as "the Trustees"), Hampshire Property Management Group, Inc.("the

Property Manager"), and Marcus, Errico, Emmer & Brooks, P.C. ("the Law Firm"), the

Defendants in the above captioned matter, pursuant to Fed.R.Civ.P 12(b)(6), and hereby

move to dismiss counts I, III, IV, V, VI and VIII of Plaintiffs' complaint for failure to

state a claim upon which relief can be granted.

## BACKGROUND

The allegations in Plaintiffs' complaint arise out of their prior ownership of a

residential condominium unit at the Millbank Place Condominium in Northampton, MA,

and efforts by the Defendant Trustees to collect past due common charge assessments

from the Plaintiffs.

## ARGUMENT

### I.    DEFENDANTS HAVE MET THE NECESSARY STANDARD UNDER RULE 12(B)(6) TO DISMISS COUNTS I, III, IV, V, VI AND VIII OF PLAINTIFFS' COMPLAINT.

The court can dismiss for failure to state a claim " 'only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.' " *Berezin v. Regency Sav. Bank,* 234 F.3d 68, 70 (1st Cir.2000) (quoting *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 52 (1st Cir.1990)).   When ruling on a Rule 12(b)(6) motion, the court must accept all well-pleaded factual allegations of plaintiff's complaint as true and must give plaintiff the benefit of all reasonable inferences. *LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 508 (1st Cir.1998).   Dismissal is inappropriate unless, accepting as true the well-pleaded facts in the complaint and viewing them in the light most favorable to the plaintiff, "it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Mylan Lab., Inc. v. Matkari,* 7 F.3d 1130, 1134 & n. 4 (4th Cir.1993) (internal quotation marks omitted), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994).   Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *Richmond, F. & P. R.R. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993).

Based solely on the allegations in the Plaintiffs' complaint, this Court should dismiss Counts I, III, IV, V, VI and VIII of that complaint.

2

## II.    THERE IS NO CONTRACTUAL RELATIONSHIP BETWEEN THE TRUSTEES AND THE CLOUTIERS.

Count I of Plaintiffs' complaint alleges that the Trustees breached a contract with the Cloutiers, thereby causing damages. The "contract" allegedly breached is the Master Deed of the Millbank Place Condominium. (Complaint ¶¶ 42-45).

As a matter of fact and law, there is no contract between an organization of unit owners and individual unit owners such as the Cloutiers. The obligations contained in the master deed of a condominium are not contractual in nature, but are instead covenants running with the land, equitable in nature, with roots in real property law. See *In re Beeter* 173 B.R. 108, 114 (Bankr. W.D. TX 1994) citing *In re Raymond* 129 B.R. 354 (Bankr. S.D. NY 1991). The documents creating the condominium define the parties' interests in the real property owned by them and establish the parties' mutual obligations that attach to and run with the land. *Id.* The obligations established by the constituent documents serve not to benefit a third party, but rather the owners in common, imposing a burden on each owner for the benefit of all owners and have their source in *Spencer's Case*, 77 Eng.Rep. 72 (Q.B. 1583).[1]

Moreover, the organization of unit owners is not a discrete party performing maintenance services for a fee. It is merely the agent of every unit owner, a mechanism created as part and parcel of the servitude. There is no contract to impose the servitude on the property. No consideration passed, no meeting of the minds took place. *In re Beeter*, supra, 173 B.R. at 115. See also *Noble v. Murphy,* 34 Mass.App.Ct. 452, 612 N.E.2d 266 (1993). Without the foregoing, there can be no contractual relationship and the Plaintiffs' claims for breach of contract must fail.

---

[1] The Court in *Spencer's Case* established the rule that covenants that touch and concern the land may bind successors not otherwise in privity.

**III.    THERE IS NO IMPLIED OR EXPRESS WARRANTY OF HABITABILITY BETWEEN THE TRUSTEES AND UNIT OWNERS SUCH AS THE CLOUTIERS.**

Count III and Count IV of Plaintiffs' complaint seek damages for breach of an implied warranty (Complaint ¶¶ 50-53) and breach of an express warranty (Complaint ¶¶ 55-58), respectively. At the outset, the Plaintiffs fail to identify what type of warranty entitles them to recovery. All that can be gleaned from the complaint is the assertion that the master deed to the Millbank Place Condominium includes implied and express warranties to the Cloutiers.

**1.    Unit owners like the Cloutiers can only pursue a breach of warranty claim after purchasing a new condominium unit from the developer.**

The Cloutiers lack standing to bring a breach of warranty claim against the Trustees. Individual unit owners may bring a claim for breach of the implied warranty of habitability only if the owners can establish, *inter alia*, that they purchased a new residential condominium unit from a builder-vendor, and that a latent defect in the unit created a substantial question of safety or made the condominium unfit for human habitation. *Berish v. Bornstein*, 437 Mass. 252, 264, 770 N.E.2d 961 (2002) citing *Albrecht v. Clifford*, 436 Mass. 706, 711-712, 767 N.E.2d 42 (2002). The unit owner's claim must also be brought within the three-year statute of limitations and the six-year statute of repose set forth in M.G.L. c. 260, § 2B. *Berish v. Bornstein,* 437 Mass. at 264.

When there are defects or other problems in the common areas of the condominium, the organization of unit owners has the exclusive right to seek a remedy. M.G.L. c. 183A, § 10(b)(4). *Id.*, 437 Mass. at 265. See also *Strauss v. Oyster River Condominium Trust*, 417 Mass. 442, 445, 631 N.E.2d 979 (1994).

4

The complaint contradicts itself about whether the supposed defect is within the Cloutiers' unit (Complaint ¶¶ 14, 50, 55) or within the Common Area (Complaint ¶¶ 51, 56). Regardless of the Cloutiers' position, they utterly lack standing to assert breach of warranty claims. If the alleged defect is within the Common Area, only the Trustees can pursue the claim. If the defect is within their unit, the Cloutiers can pursue the claim only if they bought a new unit from the developer. The complaint does not allege, nor can it allege, that the Cloutiers purchased Unit #12 directly from the developer. Therefore, Counts III and IV of the complaint must be dismissed.

**2.    The Trustees cannot be liable for a breach of warranty of habitability because they were not the Cloutiers' landlords.**

It is unclear whether the Cloutiers believe their breach of warranty claims arise from renting their unit to tenants. It is clear, however, that the Cloutiers also cannot advance a breach of warranty claim based on a landlord-tenant theory. In order to assert a claim for breach of a warranty of habitability, the Cloutiers must first establish a landlord-tenant relationship with the Trustees. Yet there is a fundamental difference between a landlord-tenant relationship and a condominium association-unit owner relationship.

"[T]he landlord-tenant relationship is . . . contractual in nature wherein the landlord promises to deliver and maintain the premises in a habitable condition and the tenant promises to pay rent for the use thereof." *Shwachman v. Davis Radio Corp.*, 1994 WL 879712 (Worcester Super. Ct. 1994)[2] (*citing Boston Housing Auth. v. Hemingway*, 363 Mass. 184, 198-199, 293 N.E.2d 831 (1973)). The warranty of habitability springs from the agreement between landlord and tenant, and as such, only is enforceable against

---

[2] Cases from the Massachusetts Superior and District Courts are not binding on this Court, but are cited merely as an indication of how Massachusetts Courts are treating certain issues.

a landlord. *See* M.G.L. c. 186, § 14. This principle remains the same in instances where the property at issue is a condominium unit.

"The condominium is a form of property ownership in which the unit owner retains an exclusive fee interest in his individual unit in addition to an undivided interest with all other unit owners in the condominium's common areas and facilities." *Golub v. Milpo*, 402 Mass. 397, 400, 522 N.E.2d 954, 957 (1988). "The division between individual and common rights is basic to the theory of condominium ownership." *Id.* 402 Mass. at 401.

In *Frisch v. Bellmarc Mgt., Inc.*, the New York Supreme Court, Appellate Division, First Department ("New York Court"), in a well-reasoned opinion, had occasion to review and analyze thoroughly the issue of whether the warranty of habitability applies between the tenant of a landlord/unit owner and the organization of unit owners of a condominium and their management agent. *Frisch*, 190 A.D.2d 383, 597 N.Y.S.2d 962 (A.D. 1 Dept. 1993). In *Frisch*, the major part of the complaint concerned water intrusion into a condominium unit relating to leaks from the terrace and balcony.

Basing its opinion on the relationship between landlord and tenant created by the lease agreement and the nature of ownership interests in condominiums, the New York Court determined that a tenant who leases a condominium unit from a landlord/unit owner may assert a claim for breach of the warranty of habitability against such landlord/unit owner, but the unit owner cannot assert a habitability claim against the organization of condominium unit owners or their management agent because no landlord-tenant relationship exists.

To the extent that the Cloutiers rely upon a landlord-tenant theory, they cannot prevail on their breach of warranty claims. Therefore, this Court should dismiss Counts III and IV of the complaint.

## IV.    THE TRUSTEES OWE A FIDUCIARY DUTY TO THE CONDOMINIUM ASSOCIATION, BUT NOT TO INDIVIDUAL UNIT OWNERS.

Count V of Plaintiffs' complaint alleges that the Trustees at Millbank Place somehow breached a fiduciary duty to the Cloutiers by failing to make repairs (Complaint ¶ 63) and failing to account for rents (Complaint ¶ 64). These claims have no basis in law, and must be dismissed.

As a matter of law, the members of the governing board of the organization of unit owners at a condominium owe a fiduciary duty to the organization and not an individual. In 1990, the Massachusetts Supreme Judicial Court, in *Cigal v. Leader Development Corp.,* 408 Mass. 212, 557 N.E.2d 1119 (1990), clearly and conclusively addressed the proper procedural path that must be taken by a party seeking to assert a claim for breach of fiduciary obligations based upon the failure to maintain the common areas. In *Cigal*, as in the case at bar, the fiduciary duty on which the plaintiffs based their claim is a duty owed to the corporation -- the condominium association -- not to individual stockholder -- the unit owners. See also *Bessette v. Bessette*, 385 Mass. 806, 809-810, 434 N.E.2d 206 (1982).

The position of condominium trustee is not unlike that of a corporate board member, and a condominium trustee represents the unit owners in the same manner as a corporate officer represents stockholders. Upon taking office, a condominium board member assumes two basic duties to the entity he or she represents. Those duties are due care and loyalty. The obligation to carry out those duties runs to the condominium

7

association and not any other person or entity with which the board member is connected.

See *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, 114 Cal.App.3d 783,

171 Cal.Rptr. 334 (1981); *Cohen v. Kite Hill Community Association*, 142 Cal.App.3d

642, 191 Cal.Rptr. 209 (1983).

The Cloutiers have no standing to assert breach of fiduciary duty claims against

the Condominium Association or any member thereof.  The fiduciary duties alleged to

have been breached were obligations that the Trustees owed to the organization of unit

owners, and not any one unit owner.  The Cloutiers' claims lie solely with the

organization of unit owners as a whole.  To the extent that the Cloutiers seek to bring

their claims as a derivative action, they must strictly comply with the provisions of

Mass.R.Civ.P. 23.1.  See *Cote v. Levine,* 52 Mass.App.Ct. 435, 754 N.E.2d 127 (2001).[3]

### 1.    The Cloutiers cannot meet the requirements of Mass.R.Civ.P. 23.1.

Although individuals may assert a claim of breach of fiduciary duty as a

derivative action (*Downey v. Vernitron Corp.*, 559 F. Supp. 1081 (D.C. Mass. 1982)), it

can only be done *if the individuals comply with the prerequisites contained in*

*Mass.R.Civ.P. 23.1.*  See *Cote v. Levine,* 52 Mass.App.Ct. 435, 754 N.E.2d 127 (2001);

*Cigal v. Leader Development,* 408 Mass. at 219, 557 N.E.2d at 1123 (emphasis supplied).

Mass.R.Civ.P. 23.1 provides in relevant part:

> In a derivative action brought by one or more shareholders or
> members to enforce a right of a corporation or of an unincorporated
> association, the corporation or association having failed to enforce a right
> which may properly be asserted by it, the complaint shall be verified by
> oath and shall allege that the plaintiff was a shareholder or member at the
> time of the transaction of which he complains or that his share or
> membership thereafter devolved on him by operation of law from one who
> was a stockholder or member at such time.  **The complaint shall also**

---

[3] A number of Massachusetts Superior Courts and Housing Courts have ruled similarly, and these decisions
can be provided by the Defendants at this Court's request.

8

**allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.** The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs. (emphasis added)

The Cloutiers' complaint clearly fails to comply with Mass.R.Civ.P. 23.1.

**2.    The Cloutiers have not made a proper demand on the trustees or alleged their reason for failure to do so.**

The first requirement is that the Plaintiffs have made demand on the governing board to bring an action for breach of fiduciary duty. While the Cloutiers did send a Chapter 93A demand letter to the Trustees, their letter is insufficient under Rule 23.1 as a matter of law. The 93A letter, which is attached as Exhibit "F" to Plaintiffs' complaint, does not request that the Trustees bring an action for breach of fiduciary duty.

In order to avoid the obligation to make demand upon the governing board, a plaintiff must allege facts to show that the members thereof are "interested." *Cote v. Levine,* 52 Mass.App.Ct. at 441. If a majority of the board is interested, then demand is excused. But those facts must be pled with great particularity. If the plaintiff's demand was refused and the directors were disinterested, the plaintiff must show that the demand was wrongfully refused. *Cote v. Levine,* 52 Mass.App.Ct. at 442. There are no such allegations in the Cloutiers' complaint.

**3.    The Cloutiers have not alleged demand on the other members of the organization or the reason for their failure to do so.**

Moreover, if the members of the governing board refuse the plaintiffs' demand, the plaintiffs must then present the demand to all of the remaining shareholders. *Cote v. Levine,* 52 Mass.App.Ct. at 442.  There is no assertion that the Cloutiers, as a result of the inability or unwillingness of Trustees to pursue a complaint for breach of fiduciary duty, have presented the claim to other unit owners and have failed to obtain their intervention.

The exception to this requirement occurs where demand would be futile because the other shareholders are interested or where the number of other shareholders is very large. *Cote v. Levine,* 52 Mass.App.Ct. at 442.  There is nothing in the complaint before this Court setting forth the reasons that either of such attempts, if any, was in fact undertaken or failed.  There are no statements, *at all*, relative to the basis for the lack of the Cloutiers' effort to make the required demands. *Pupecki v. James  Madison Corp.,* 376 Mass. 212, 382 N.E.2d 1030 (1978).

The Cloutiers, as Plaintiffs, have the burden to demonstrate why the Trustees are incapable of doing their duty, or the burden to show that the antagonism between the Trustees and the Condominium Association's interest is unmistakable and accordingly, they are required to state with particularity the cause of the failure to induce action. *In re Kauffman Mut. Fund Actions,* 479 F.2d 257, *cert. denied,* 94 S.Ct. 161, 414 U.S. 857, 38 L.Ed.2d. 107 (Ca.A. Mass. 1973).

More importantly, the law provides that if demand upon the governing board of the organization has been made and action declined, Massachusetts requires a *demand upon the other members of the organization* before an individual member may maintain a derivative action. *G.A. Enterprises, Inc. v. Leisure Living Communities Inc.,* 66 F.R.D.

123, affirmed 517 F.2d 24 (D.C. Mass. 1974)(emphasis supplied). No such demand was made. The failure to address the unit owners' position with respect to the Cloutiers' claims is fatal.

The failure to make a demand directly upon other members may be excused *only* when it is alleged that the majority (of the members of the organization) are corrupt or otherwise incapable of action in good faith. *Cote v. Levine,* 52 Mass.App.Ct. at 442, *Levitt v. Johnson,* 222 F.Supp. 805; vacated 334 F.2d 815, *cert. den.* 85 S.Ct. 649, 379 U.S. 961, 13 L.Ed. 556 (D.C. Mass. 1963). *Heit v. Brown,* 47 F.R.D. 33 (D.C. Mass. 1967). The Cloutiers do not allege that they brought this matter to the other unit owners and they cannot establish an exception to this requirement.

Massachusetts Courts have refused to recognize significant exceptions to the requirement that demand be made upon other members of the organization. *Pomerantz v. Clark,* 101 F.Supp. 341 (D. Mass. 1951); *Solomont T. Sons Trust. Inc. v. N.E. Theaters Operating Corp.,* 326 Mass. 99, 93 N.E.2d 241 (1950). The burden, expense and futility of making demands directly upon the other members have been held not to justify dispensing with the Massachusetts requirement. *Pomerantz v. Clark, supra.* The failure to allege within the complaint the efforts that have been made to persuade the members of the majority to seek redress, or those conditions that would have excused their failure to request such action, is *fatal. Jackson v. Stuhlfire,* 28 Mass.App.Ct. 924, 925, 547 N.E.2d 1146, quoting *Alberti v. Green,* 6 Mass.App.Ct. 41, 45 N.E.2d 534 (1938). (emphasis added). The Cloutiers have not asserted that demand has been made upon the other members of the organization of unit owners in an attempt to persuade those members to bring an action against the board for breach of fiduciary duty. They do not

11

allege what comprised such efforts and they certainly have not set forth any condition which would have excused their efforts to do so.

Even assuming *arguendo* that the Cloutiers complied with the other requirements of Rule 23.1, they cannot fairly and adequately represent the interests of the other unit owners. The Cloutiers seek monetary damages from the Association, the only source of which is the other unit owners. Nothing could be more adverse to the interests of the other unit owners than to require them to compensate the Cloutiers monetarily.

Unless they can fairly and adequately represent the interests of the unit owners, the Cloutiers cannot maintain a derivative action under Rule 23.1.

## V.    THE TRUSTEES HAVE NOT VIOLATED THE MASSACHUSETTS CRIMINAL USURY STATUTE BECAUSE THEY HAVE NEVER MADE A LOAN TO THE CLOUTIERS.

Count VI of Plaintiffs' complaint alleges that the Trustees, by charging late fees on the Cloutiers' overdue balance, have somehow engaged in usurious behavior in violation of M.G.L. c. 271, § 49. (Complaint ¶¶ 67-71).

M.G.L. c. 271, § 49, which is entitled "Criminal Usury," provides, in relevant part, that:

> Whoever in exchange for either a **loan** of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest or expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum **loaned** . . . shall be guilty of criminal usury . . .   (emphasis added).

In a case precisely on point, a judge of the Massachusetts Superior Court held that late fees charged by a condominium association against a unit owner are not usurious as a matter of law. In *Peck v. Coffman*, 1995 WL 809892 (Mass.Super.), the Fieldstone Condominium sued Coffman to collect past due common charge assessments from him.

In his defense, Coffman asserted that the late fees charged by Fieldstone were illegally usurious. The Court found M.G.L. c. 271, § 49 did not excuse Coffman from any of the charges. The usury statute, by its own language, does not apply to transactions other than loans of money or property. *Id.* at 3. The Court also cited *Allegheny International Credit Corp. v. Bio-Energy of Lincoln, Inc.*, 21 Mass. App. Ct. 155, 485 N.E.2d 965 (1985) which held that M.G.L. c. 271, § 49 did not apply to leases.

Furthermore, M.G.L. c. 271, § 49 is a criminal statute, and, as such, must be strictly construed. *Clean Harbors, Inc. v. John Hancock Life Insurance Company*, 2004 WL 616224 (Mass.Super.) at 12. Any reasonable doubt as to the meaning of a criminal statute must be resolved in favor of a defendant, that is, against the finding of a criminal violation. *Hakim Enterprises, Inc. v. Reinhardt*, 30 Mass. App. Ct. 911, 911-912, 566 N.E.2d 115 (1991).

The Plaintiffs' complaint fails to allege that any of the Defendants made a loan to the Cloutiers. Therefore, Count VI of Plaintiffs' complaint, which alleges a violation of the usury statute, must be dismissed.

## VI.    THE PROVISIONS OF G.L. c. 93A ARE INAPPLICABLE TO CONDOMINIUM TRUSTEES, OR THEIR AGENTS.

Count VIII of the Plaintiffs' complaint alleges that all of the Defendants have violated the Massachusetts Consumer Protection Act, M.G.L. c. 93A, by various acts. (Complaint ¶¶ 76-83).

### 1.    The Trustees cannot be liable under c. 93A to the Cloutiers.

As a matter of undisputed law, M.G.L. c.93A applies only to entities engaged in trade or commerce. *M.G.L. c. 93A § 2*. The statute does not apply to transactions that are strictly private in nature and do not occur in a business context. *Lanter v. Carson*, 374

Mass. 606, 608, 373 N.E.2d 973; *Begelfer v. Najarian*, 381 Mass. 177, 190-191, 409 N.E.2d 167 (1980). The nature of a particular transaction is determined by reviewing the type of transaction; the character of the parties; the activities participated in; and whether the transaction was motivated by business or personal reasons. *Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.,* 398 Mass. 480, 491, 498 N.E.2d 1044 (1986).

In the matter before the Court, the complaint fails to allege a business relationship between the Plaintiffs and the Trustees. Without alleging the existence of a business relationship, the Plaintiffs cannot hope to recover under the Consumer Protection Act. And even if such an allegation were asserted, there can be no recovery pursuant to M.G.L. c. 93A. The organization of unit owners at a condominium, and the governing board thereof, is not engaged in trade or commerce *vis-à-vis* the individual unit owners or their tenants. *Office One, Inc. v. Lopez,* 437 Mass. 113, 769 N.E.2d 749 (2002). The Trustees receive no remuneration for their efforts. The sole purpose for the existence of the organization, and the service of the trustees, is to administer the common areas of the condominium, in which they also hold an interest. There is no mercantile component to the organization's activities. The Trustees are the elected agents of the owners. There is no trade or commerce in their activities; rather the trustees are a quasi-governmental organization. *Franklin v. Spadafora*, 397 Mass. 683, 493 N.E.2d 488 (1986).

The Massachusetts Appeals Court recently ruled on the issue of the liability of a unit owner organization under M.G.L. c.93A, in the matter of *KACT, Inc., vs. Rubin,* 62 Mass. App. Ct. 689, 700, 819 N.E.2d 610 (2004), review denied 443 Mass. 1105, 823 N.E.2d 782 (2005). In upholding the lower court ruling that the defendant condominium

association did not violate M.G.L. c. 93A, the Court held that there was no evidence that the organization of unit owners was engaged in trade or commerce. (See also *Granby Heights Association, Inc. v. William Dean,* 38 Mass. App. Ct. 266, 647 N.E.2d 75 (1996)).[4] This Honorable Court should rule similarly.

Because the Trustees of the Millbank Place Condominium are not engaged in trade or commerce, the 93A claim against them must be dismissed.

**2.    The Cloutiers cannot recover under c. 93A against the Property Manager or against the Law Firm.**

The Cloutiers do not allege that they were involved in a business relationship with the Property Manager or with the Law Firm; in fact, there was no relationship between the Cloutiers and the Property Manager or the Law Firm. At all times, the Trustees of Millbank Place Condominium were charged with the responsibility relative to the common areas of the condominium. This responsibility cannot be delegated to any other entity. M.G.L. c. 183A. *Cigal v. Leader Development Corp.,* 408 Mass. 212, 557 N.E.2d 1119 (1990).

Both the Property Manager and the Law Firm acted as agents for the Trustees. Their respective obligations run to the Millbank Place Condominium Trust as an entity and to the Trustees thereof, but not to individual unit owners or their tenants. See *Nichols v. Kirkpatrick Mgt. Co.* 536 N.E.2d 565, 566-567 (Ind.App. 3 Dist. 1989). (cf *Addis v. Steele*, 38 Mass.App.Ct. 433, 440, 648 N.E.2d 773, 778 (1995) (rev. den.)).

The relationship between the Cloutiers and the Property Manager cannot form the basis for liability under the Consumer Protection Act. When no contractual or active business relationship exists between the parties, there can be no liability under c. 93A.

---

[4] A number of Massachusetts Superior Courts have ruled similarly, and these decisions can be provided by the Defendants at this Court's request.

*Chestnut Hill Development Corp. v. Otis Elevator* , 653 F.Supp. 927, 933 (D.Mass. 1987). *Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 446 N.E.2d 681 (1983).

In an analogous case, the Massachusetts Supreme Judicial Court reviewed this issue when a corporation brought an action for unfair trade practices against the attorney for a corporate shareholder. *First Enterprises, Ltd. v. Cooper*, 425 Mass. 344, 680 N.E.2d 1163 (1997). The attorney acted as an agent for the shareholder just as the Property Manager and the Law Firm acted as agents for the Trustees. The attorney defendant filed a motion to dismiss. The Court held that there must be commercial relationship between plaintiff and defendant to survive a motion to dismiss on 93A liability. *First Enterprises, Ltd. v. Cooper*, 425 Mass. at 347. The Court held that the dispute at issue in the *First Enterprises* case was an internal dispute and that by representing one of the parties, the defendant did not inject himself in trade or commerce. *First Enterprises, Ltd. v. Cooper*, 425 Mass. at 348.

Neither the Property Manager nor the Law Firm ever had a business relationship with the Cloutiers. Without a business relationship, there can be no foundation for a claim under M.G.L. c.93A. By virtue of sending notices on behalf of the Trustees, neither the Property Manager nor the Law Firm injected themselves into trade or commerce with the Cloutiers. As agents, both the Property Manager and the Law Firm merely sent notices of charges due; they did not impose the charges upon which the Cloutiers rely to support their assertion of 93A liability. There can be no liability under 93A against the Property Manager or the Law Firm.

**3.    An agent cannot be liable to a third party for an act for which its principal would not be liable.**

An agent owes no greater duty to a third party than that owed by the principal. (Restatement, Agency, Second, § 347 (2))  See also *Albright v. Trustees of the Villa Grande Condominium and Charles James Associates, Inc.*, Appellate Division of the District Courts Northern District Case No. 9707 May 24, 2001.

It is the lack of a business relationship between the Cloutiers and the Trustees which sounds the death knell for the claims against the Property Manager and the Law Firm. *Office One v. Lopez*, 437 Mass. 113, 769 N.E.2d 749 (2002).  (See also *KACT, Inc., v. Rubin,* 62 Mass. App. Ct. 689, 700, 819 N.E.2d 610 (2004), review denied 443 Mass. 1105, 823 N.E.2d 782 (2005) and *Granby Heights Association, Inc. v. William Dean,* 38 Mass. App. Ct. 266, 647 N.E.2d 75 (1996).

At all times, the Property Manager and the Law Firm were merely carrying out the directions of the Trustees.  If the actions by the Trustees are not founded upon a commercial transaction, it does not become commercial in nature when carried out by the Property Manager or the Law Firm.

**4.    A c. 93A claim must be dismissed if the underlying claim is dismissed.**

It is axiomatic that if an underlying claim, such as the criminal usury claim in Count VI of Plaintiffs' complaint, is dismissed, then any 93A liability based on that underlying claim must also be dismissed. *Saveall v. Adams*, 36 Mass. App. Ct. 349, 354, 631 N.E.2d 561 (1994).

## CONCLUSION

For all of the foregoing reasons, the Defendants pray that this Honorable Court

dismiss Count I, Count III, Count IV, Count V, Count VI and Count VIII of the

Plaintiffs' Complaint.

Respectfully submitted,

Counsel for the Defendants,

Trustees of Millbank Place
Condominium Trust, Hampshire
Property Management Group, Inc.
and Marcus, Errico, Emmer
& Brooks, P.C.

_____
Paul J. Barresi/BBO #566757
Marcus, Errico, Emmer & Brooks, P.C.
45 Braintree Hill Office Park #107
Braintree MA  02154
781-843-5000

DATED:  April 27, 2005

### CERTIFICATE OF SERVICE

I, Paul J. Barresi, hereby certify that on April 27, 2005, I served the
foregoing Defendants' Motion to Dismiss Counts I, III, IV, V, VI and VIII upon Joseph J.
Lange, Esq., Lyon & Fitzpatrick, LLP, 14 Bobala Road, 4th Floor, Holyoke, MA 01040
by mail, first class postage prepaid.

_____
Paul J. Barresi

18

3 Mass.L.Rptr. 697, 1995 WL 809892 (Mass.Super.)

Superior Court of Massachusetts.
Gilbert PECK [FN1] and others [FN2]

FN1. Trustee of the Fieldstone Condominium Trust.

FN2. Warren Anderson, Patricia Stell, Beverly B. Hart and Gloria Miller, Trustees of the Fieldstone Condominium Trust.

v.
Gary D. COFFMAN and another. [FN3]

FN3. Grafton Suburban Credit Union as defendant and trustee defendant.

No. CA 930078.
June 19, 1995.

MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ASSESSMENT OF DAMAGES

TOOMEY, Judge.
Introduction
*1 The plaintiffs, Trustees of the Fieldstone Condominium Trust ("the Trustees"), brought this action in equity to establish that defendant Gary Coffman ("Coffman") owes a debt to the Fieldstone Condominium Trust ("the Trust"), to establish a lien upon Coffman's condominium unit, and to gain permission from this Court to sell Coffman's unit in order to collect the amount owed. The matter is before the Court on the Trustees' motion for summary judgment, assessment of damages, and entry of findings and order. For reasons stated, the motion is allowed.
Background
Coffman owns unit number 10 of the Fieldstone Condominiums ("Fieldstone"). Fieldstone was established, pursuant to G.L.c. 183A, by a Master Deed dated September 28, 1987. The Trust was contemporaneously established on September 28, 1987 by a Declaration Of Trust With By-Laws. Coffman acquired title to unit number 10 on November 11, 1987. Defendant Grafton Suburban Credit Union holds a first mortgage on the unit.
Section 5.2 of the Declaration of Trust directs the Trustees to assess each condominium unit its share of the common condominium expenses. Pursuant to that directive, the Trustees assessed Coffman's unit a proportionate share of the common expenses. Coffman has failed to pay the common assessments since January 1, 1992. The common expenses balance due as of May 1, 1995 was $5,244.63. The balance will increase by $152.39 on the first of every subsequent month.
Section 5.4 of the Declaration of Trust directs the Trustees to impose a late charge of $25.00 on all payments that are more than 15 days overdue. In accordance with that directive, the Trustees have assessed late fees of $25.00 per month for each month the common expense charge was not paid by the fifteenth of the month. As of April 15, 1995, the late fees totalled $1,000.00. Coffman has also failed to pay two special assessments of $100.00 each which were due in September and October, 1993. The Trustees have spent $2,977.75 in costs and attorneys fees pursuing this action.
The Trustees now seek a judgment for the common expense arrearage, late fees, costs and attorney fees, and for continuing charges as they accumulate on the first and fifteenth of each month. The Trustees also request a lien against Coffman's unit for the amount of the judgment and a judicial determination that the lien has priority over other liens as provided by G.L.c. 183A, § 6(c). Finally, the Trustees ask the Court's permission to sell Coffman's unit to collect the amount owed.

## DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). *Cassesso v. Commissioner of Correction*, 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976); MassR.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue "and [further,] that the moving party is entitled to judgment as a matter of law." *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989).

**\*2** Coffman does not dispute the Trustees' view of the facts as stated herein. Rather, he has asserted two arguments in support of his position that the judgment requested by the Trustees should not enter. First, Coffman asserts that, in retaliation for a suit Coffman brought against the Trust, the Trustees have refused to repair his unit, and that the failure to repair has rendered Coffman unable to sell his unit and pay his debt. Second, he claims that the late fees charged by the Trust are **usurious**. Neither argument is persuasive.

A. Failure to Repair

G.L.c. 183 A, § 7 provides that:

No unit owner may exempt himself from liability for his contribution toward common expenses by waiver of the use or enjoyment of any of the common areas and facilities or by abandonment of the unit or otherwise; and no unit owner shall be entitled to an offset, deduction, or waiver of common expenses or other charges levied or lawfully assessed by the organization of unit owners. In enacting § 7, the Legislature codified the decision of the Supreme Judicial Court in *Trustees of Prince Condominium Trust v. Prosser*, 412 Mass. 723 (1992). Analyzing whether a unit owner is entitled to an offset of common expense charges, the Court had stated that, because a unit owner's refusal to pay "would threaten the financial integrity of the entire condominium operation," a unit owner's grievance against condominium trustees may not exempt the owner from the collection of lawfully assessed common area expense charges. *Id. at 725-26.*

Coffman asserts that he does not have to pay the fees because the Trustees have thwarted his attempts to sell his unit. The law is clear, however, that, as a unit owner, Coffman is not entitled to set-off from the assessments and fees he owes the Trust any debt the Trustees incurred to him by their inaction. Therefore, Coffman's assertion of a grievance against the Trustees is not a valid defense to this action.

B. The Defense of **Usury**

The Massachusetts Appeals Court has held that, pursuant to G.L.c. 183A, § 7, a condominium unit owner may not challenge the lawfulness of a common expense assessment by refusing to pay it. *Blood v. Edgar's, Inc.*, 36 Mass.App.Ct. 402, 406 (1994). Rather, the unit owner must pay the assessment under protest and thereafter seek a judicial determination of its legality and suitable reimbursement. *Id.* The Appeals Court held, however, that the *Blood* rule would not apply retroactively. *Id.* Accordingly, because the Trustees brought this action against Coffman prior to the *Blood* decision, the *Blood* principle may not be applied to this case, and Coffman would not be **required** to pay the charges if they were illegal. We must, therefore, assess the legality of the instant late fees.

Coffman asserts that the late fees are illegal by reason of their **usurious** quality. If the fees are **usurious,** Coffman would not be **required** to pay them.

G.L.c. 271, § 49(a), the Massachusetts **criminal usury** statute, provides that:

**\*3** Whoever in exchange for either a **loan** of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum **loaned** or the equivalent rate for a longer or shorter period, shall be guilty of **criminal usury** ... For the purpose of this section the amount to be paid upon any **loan** for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of **loans**, forbearance to enforce payment, and all other sums charged against or paid to or be paid by the borrower for making or securing directly or indirectly the **loan** ...

Charges for overdue payments, as well as for attorneys fees, are included in determining whether an interest rate exceeds 20% per annum. *Begelfer v. Najarian,* 381 Mass. 177, 182, 189 (1980). The **usury** statute, by its own language, does not apply to transactions other than **loans** of money or property. See *Allegheny International Credit Corp. v. Bio-Energy of Lincoln, Inc.,* 21 Mass.App.Ct. 155 (1985) (holding that the **usury** statute does not apply to leases). The fees assessed against Coffman by the Trustees do not arise out of a **loan** of money or property. Therefore, the fees are not rendered

unlawful by the **usury** statute and Coffman is not excused under pre-*Blood* analysis from paying said fees.

Because the fees assessed by the Trustees against Coffman are lawful and he has no reason not to pay them, judgment must enter for the Trustees.

DAMAGES

G.L.c. 183A, § 6 allows the Trustees to assess against Coffman expenses incurred "as a result of the unit owners failure to abide by the **requirements** of this chapter or the **requirements** of any master deed, trust, by-laws, restrictions, rules or regulations." The Trustees may also assess "any fees, attorneys fees, charges, late charges, fines, cost of collection and enforcement, court costs and interest charged pursuant to this chapter against the unit owner." *Id.*

As of May 1, 1995, Coffman owed the following sums to the Trust:

|  | Charges | | Total |
|---|---|---|---|
| Monthly Assessments | | | |
| January, 1992 | $    99.00 | /month | $    99.00 |
| February to December, 1992 | 115.50 | /month | 1,270.50 |
| January to December, 1993 | 107.00 | /month | 1,284.00 |
| January, 1994 to May, 1995 | 152.39 | /month | 2,590.63 |
| Special Assessments | | | |
| September, 1993 | 100.00 | | 100.00 |
| October, 1993 | 100.00 | | 100.00 |
| Late fees | | | |
| January, 1992 to April, 1995 | 25.00 | /month | 1,000.00 |
| Other | | | |
| Attorneys fees and collection costs | 2,977.75 | | 2,977.75 |
| TOTAL: | | | $9,421.88 |

In addition, common fee costs continue to accumulate on the first of every month in the amount of $152.39. Late fees continue to accumulate on the fifteenth of every month in the amount of $25.00. By statute, these expenses constitute a lien against the unit. G.L.c. 183A, § 6(a)(ii). A lien is therefore established for the total amount owed.

**\*4** G.L.c. 183A, § 6(c) gives the lien hereby established priority over "all other liens and encumbrances ... except (i) liens and encumbrances recorded before the recordation of the master deed, (ii) a first mortgage on the unit recorded before the date on which the assessment sought to be enforced became delinquent, and (iii) and liens for real estate taxes and other municipal assessments or charges against the unit." Additionally, the lien has priority over a first mortgage to the extent of common expense assessments which became due during the six months immediately preceding the institution of this action. G.L.c. 183A, § 6(c). Finally, the portion of the lien arising from attorneys fees has priority over a first mortgage if notice, as specified by statute, was sent to the first mortgagee. *Id.*

Common expenses were assessed in the amount of $884.50 for July, 1992 through January, 1993, the six months preceding the institution of this action. The Trust's lien, accordingly, has priority over the first mortgage in the amount of $884.50. The Trustees sent the notice, **required** by statute, to the first mortgagee; consequently, the Trust's lien also has a priority for costs and attorneys fees in the amount of $2,977.75.

G.L.c. 254, § 5A allows the Trust to collect the amount of its lien by selling the condominium unit after complying with the notice requirements of G.L.c. 254, §§ 5 and 5A. Because expenses incurred by the Trust in selling the unit will be incurred as a result of Coffman's failure to pay the common expense assessment, he is liable to the Trust for the expenses of sale. G.L.c. 183A, § 6(a)(ii). Such expenses include advertising costs, auctioneer fees, and attorneys fees.

ORDER

For the reasons stated *supra,* it is hereby ORDERED that the plaintiffs' motion for summary judgment be GRANTED. It is furthered ORDERED that damages are awarded to the plaintiffs in the amount of $9,421.88. Said amount shall increase by $152.39 on June 1, 1995 and on the first of the every month thereafter, and by $25.00 on May 15, 1995 and the 15th of every month thereafter for as long as Coffman remains as owner of the unit and in default of his obligations defined herein. It is further ORDERED that a lien be placed on Coffman's condominium unit, and that said lien shall have the priority stated *supra.* It is further ORDERED that the plaintiffs may collect the amount owed to them

by selling Coffman's condominium unit, in the manner provided by law, and that Coffman shall be liable to them for the expenses, if any, associated with such sale.

Mass.Super.,1995.

Peck v. Coffman

3 Mass.L.Rptr. 697, 1995 WL 809892 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in N.E.2d                                                                    Page 1

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

**H**

Superior Court of Massachusetts.
**CLEAN HARBORS,** INC.
v.
**JOHN HANCOCK** LIFE INSURANCE
COMPANY et al. [FN1]

FN1. **John Hancock** Variable Life
Insurance Company; Signature 4 Limited;
Signature 5 L.P.; Special Value Bond
Fund, LLC; Arrow Investment Partners;
The Bill & Melinda Gates Foundation;
Hare & Co.; Blazerman & Co.; and
Coastledge and Co.

No. 024343BLS.

March 15, 2004.

*MEMORANDUM AND ORDERS ON CROSS
MOTIONS FOR SUMMARY JUDGMENT AND
RELATED MATTERS*

ALLAN VAN GESTEL, Justice of the Superior
Court.

*1 This matter comes before the Court on
Defendants' Motion for Summary Judgment (Paper
# 46), Clean Harbors, Inc.'s Motion for Partial
Summary Judgment (Paper # 54), and the all too
frequent array of ancillary related motions to
impound documents, to strike supporting materials,
to file memoranda in excess of 20 pages, and the
like.

*BACKGROUND*

The plaintiff, Clean Harbors, Inc. ("Clean Harbors"
or the "Company"), is a publicly traded company
that maintains a vast network of service centers and
waste management treatment and disposal facilities
and provides a broad range of environmental
services. Clean Harbors' stock has been publicly
traded on the NASDAQ exchange under the symbol

"CLHB" since 1987. Clean Harbors' gross revenues
for 2003 are projected to exceed $650 million.

The defendant John Hancock Life Insurance
Company ("John Hancock") is a Massachusetts
insurance company, providing a broad array of
insurance and investment products to retail and
institutional customers. John Hancock also is an
investor in a range of investments, including public
and private securities. Like essentially all
businesses, John Hancock intends that its revenue
producing activities and operations will generate a
sufficiently stable stream of income to meet its
obligations to its policyholders, shareholders and
investors.

The defendant John Hancock Variable Life
Insurance Company ("JHVL") is an affiliated
company of John Hancock that provides variable
life insurance coverage and an investment return to
an underlying portfolio of investments chosen by
the policyholders.

The defendants Signature 4 Limited ("Signature 4")
and Signature 5 L.P. ("Signature 5") are each
partnerships formed under the laws of and
maintaining registered offices in the Cayman
Islands. John Hancock participated in the formation
of Signature 4 and Signature 5 and currently serves
as their respective portfolio advisor.

The defendant Arrow Investment Partners
("Arrow") is a partnership formed and existing
under the laws of California. Arrow was created to
acquire and actively manage a portfolio of
investments for a small number of individual
investors. Arrow often invests in high-yield debt
securities.

The defendant Bill & Melinda Gates Foundation
(the "Gates Foundation") is a charitable trust,
formed and existing under the laws of the State of
Washington. The assets of the Gates Foundation are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

**(Cite as: 2004 WL 616224 (Mass.Super.))**

Page 2

invested pending distribution for the benefit of selected charitable causes.

The defendant Special Value Bond Fund, L.L.C. ("Special Value") is a limited liability company formed and existing in the State of Delaware. Special Value is a private investment fund established to acquire and actively manage a diverse portfolio of investments.

The remaining defendants, Hare & Company, Blazerman & Co., and Coastledge & Co., are each business entities that, at least for the purposes of this case, hold certain promissory notes issued by Clean Harbors on behalf of respectively Signature 4 and Signature 5, the Gates Foundation and Arrow.

*2 Clean Harbors was founded in 1980. At all relevant times, Clean Harbors' corporate management was comprised of intelligent, competent, and "reasonably sophisticated" business people.

The mid-to-late 1990s were turbulent times for Clean Harbors and the industrial waste management industry as a whole. Growing excess capacity among industrial waste service providers, along with decreasing waste volumes, resulted in deteriorating pricing throughout the industry. This excess capacity created fierce competition that resulted in irrationally low pricing and net losses for many service providers. Various industry participants, including two of Clean Harbors' largest competitors, Safety-Kleen Corp. ("Safety-Kleen") and Philip Services Corp. ("Philip"), ultimately were forced to seek bankruptcy court protection.

Clean Harbors' financial performance in the mid-to-late 1990s was adversely affected by the general "turmoil" in the industrial waste management industry. Clean Harbors suffered net losses for six straight years from 1995 through 1999, and its stock price plunged from a high of $17.50 per share in 1993 to a low of slightly more than $1.00 per share in 1999.

Clean Harbors had $50 million in 12 1/2% senior notes coming due in May 2001 (the "Outstanding

Indebtedness"). Clean Harbors' management was aware that the failure to refinance that Outstanding Indebtedness "could materially adversely affect the Company." Accordingly, refinancing Clean Harbors' Outstanding Indebtedness became a priority for its management in the months and years leading up to the May 2001 repayment deadline.

Although there apparently was an improvement in conditions in the waste management industry starting in 1999, and Clean Harbors' financial picture itself improved, it encountered difficulty in refinancing the Outstanding Indebtedness in 2000. As a result, in October 2000, Clean Harbors retained Deutsche Bank Securities, Inc. ("Deutsche Bank") to "act as financial advisor in the structuring ... of a new credit Facility ... and as exclusive agent in connection with the private placement ... of subordinated debentures ... to be issued by" Clean Harbors. In its role as exclusive placement agent for Clean Harbors, Deutsche Bank, with the prior approval of Clean Harbors, was authorized to

> contact potential investors, assist in the negotiation and structuring of the Facilities and Securities, and provide related services that Deutsche Bank deems advisable and reasonable that may facilitate the successful completion of the Structuring and Offering ...

Deutsche Bank is an international investment concern that, through its Global Finance division, provides ideas, access and opportunities to emerging growth, mid and large capitalization companies through a complete range of investment banking products, industry sectors and regional markets. Deutsche Bank had served as a financial advisor to Clean Harbors in the past, including in the placement of the $50 million of 12 1/2% senior notes that were coming due in May 2001.

*3 Deutsche Bank held a series of meetings with Clean Harbors' management for the purpose of understanding Clean Harbors' needs, identifying financing alternatives, and beginning the process of compiling the necessary solicitation materials. In the course of those meetings, Deutsche Bank warned that, "[d]espite Clean Harbors' recent momentum, the Company face[d] tight capital market conditions in refinancing its 12.50% Senior

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

Notes due May 2001." Deutsche Bank stated that "[h]igh-yield public bonds within a single B category [were] currently trading to yield 14% to 15%," that "new issuance ha [d] come to a virtual standstill," and that, "[a]s a result of these issues, current capital raising efforts [were] focused on the asset based loan market and the private mezzanine debt market." Finally, Deutsche Bank predicted that "Clean Harbors [would] be required to address significant difficulties experienced by other waste services companies as a result of their aggressive consolidation strategies," citing Safety-Kleen and Philip as examples. These negative factors, among others, were expected to drive up the cost of any refinancing package that Clean Harbors was able to arrange.

Deutsche Bank reviewed various potential financing structures with Clean Harbors, including additional secured borrowing, a further equity offering, a public debt offering, and an unsecured private or mezzanine debt offering. Clean Harbors ultimately chose to pursue a mezzanine finance deal because the other alternatives either were not viable or were deemed too expensive.

Clean Harbors' management understood Deutsche Bank's warnings concerning the tight capital markets that existed in the fall of 2000 and the resulting implications for Clean Harbors' planned financing. An internal presentation by management to Clean Harbors' Board of Directors in the fall of 2000 predicted that the Company probably could obtain mezzanine financing to "fill the void" left by its primary lenders, but that such financing was likely to be "EXPENSIVE."

Deutsche Bank, acting for Clean Harbors, began soliciting mezzanine finance proposals from potential investors in late 2000. As part of that process, Deutsche Bank provided potential investor candidates with a lengthy "Confidential Information Memorandum" that contained, among other things, extensive background data on Clean Harbors and a "Summary of Terms" that Clean Harbors was prepared to offer investors.

The response from potential investors was "less

than ... originally hoped for." Only a small handful of investors expressed much interest in the deal, and only two--John Hancock and Tannenbaum & Co.--offered proposed term sheets. Both submitted their financing proposals to Deutsche Bank on January 31, 2001, and those submissions were sent to Clean Harbors for review.

Despite some significant differences, Clean Harbors regarded the two alternative proposals as being "economically equivalent." Clean Harbors nonetheless favored the John Hancock proposal because John Hancock was perceived to be a "local lender" that was further along in its due diligence and thus more likely to complete the needed refinancing by the rapidly approaching May 15, 2001, deadline. Management believed, however, that John Hancock's proposed optional redemption provision was too restrictive. The John Hancock provision would have prohibited Clean Harbors from redeeming notes at any time during the first three years and required the payment of a fixed, but declining, prepayment premium thereafter.

*4 At the time, Clean Harbors had no intention of prepaying the notes in the first three years, but it wanted the flexibility to do so just in case. Accordingly, Clean Harbors instructed Deutsche Bank to discuss the "no call" language with John Hancock and negotiate a revised proposal containing a more acceptable optional redemption provision.

In response, John Hancock agreed to substitute a revised optional redemption provision that would permit Clean Harbors to prepay the notes during the first three years if it wished to do so, provided that Clean Harbors also agreed to pay a "Make Whole Amount" that reduced the remaining payments due under the notes to a present value using a discount rate that varied according to the interest rates actually paid on United States Treasury securities at the time of payment. The discount rate that the parties utilized for the purposes of the Make Whole Amount formula was consistent with the anticipated yield on new investments made by John Hancock's Bond Group overall during the preceding two years.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                      Page 4

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

A "make whole" premium is a commonly used form of prepayment charge which is meant to compensate the lender for the loss of income on reinvestment of the prepaid amount. It is not unusual for mezzanine finance terms to include a make whole in order to limit the borrower's ability or desire to repay the investment prior to its scheduled maturity. Make wholes and other optional prepayment restrictions can be found in standard forms used by insurers and various other participants in the mezzanine finance industry.

Before conveying John Hancock's revised optional redemption provision to Clean Harbors, Deutsche Bank personnel, using the mathematical formula contained in the revised provision, calculated estimated Make Whole Amounts that Clean Harbors could be required to pay if it redeemed the notes at various times in the first three years. Using then prevailing Treasury rates, the estimated Make Whole Amounts that Deutsche Bank calculated ranged from $10.5 million to $14.35 million. It is not clear from the record when, if ever, the results of these calculations were provided by Deutsche Bank to Clean Harbors.

After the management team at Clean Harbors reviewed the revised John Hancock optional redemption proposal, Deutsche Bank recommended that it be chosen because it was qualitatively "superior." Clean Harbors followed Deutsche Bank's advice and accepted the John Hancock proposal based on the "totality of all the circumstances." The parties signed a formal term sheet on February 9, 2001. The term sheet was later revised to add three additional investors--Special Value, the Gates Foundation and Arrow--as participants. John Hancock remained the lead investor with responsibility for negotiating the final deal documents.

Clean Harbors was represented by its long-time outside counsel, Davis, Malm & D'Agostine, P.C. ("Davis, Malm") in the preparation of the official refinancing documentation.

*5 Highly experienced attorneys at Davis, Malm participated. Sullivan & Worcester represented

John Hancock and the other purchasers.

It took a few weeks and lots of communication back and forth among the attorneys and their clients, all leading to a Board of Directors "unanimous [ ]" approval on April 25, 2001. In the words of Mr. Malm, the "quarterback" of the Clean Harbors refinancing legal team and the company's longtime Clerk, they were "just happy to have" the deal.

After execution of the necessary documentation, the deal was ultimately funded by John Hancock and the other purchasers on April 30, 2001. At Clean Harbors' request, the purchasers wired their respective shares of the funding amount to Clean Harbors' bank early in the day on April 30, 2001, so that Clean Harbors could meet an 11:00 a.m. deadline for the repayment of its Outstanding Indebtedness.

Section 4.1 of the Securities Purchase Agreement ("SPA"), "Dated as of April 12, 2001," reads as follows:

> The Company may prepay the Notes, in full, or in part in integral multiples of $1,000,000 on any date. Prepayments of the principal of any Notes shall be made together with (a) interest accrued on the principal amount being paid to the Settlement Date and (b) the Make Whole Amount.

Section 10 of the SPA contains 14 single-spaced pages of definitions. Included are the definitions of "Discounted Value" and "Make Whole Amount." For purposes relevant to the present motions, they read as follows:

> "Discounted Value" means, with respect to the Called Principal of any Note, an amount obtained by discounting all Remaining Scheduled Payments from their respective scheduled due dates, in accordance with accepted financial practice and at a discount factor (applied on a quarterly basis) equal to the Discount Rate with respect to such Called Principal.
>
> ...
>
> "Make Whole Amount" means:
>
> ...
>
> (ii) with respect to any other payment:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

(a) If the Settlement Date is on or before April 30, 2004, with respect to the Called Principal of any Note, an amount equal to the excess, if any, of (x) the Discounted Value over (y) the sum of (i) such Called Principal plus (ii) interest accrued and unpaid thereon, as of and due on the Settlement Date with respect to such Called Principal but in no event less than zero; or ...

Section 4.9 of the SPA reads as follows:

The Company acknowledges that the Make Whole Amount due at any optional or required prepayment of the Notes (including any prepayment required pursuant to any provision of *Section 4* or *Section 7.2* ) has been negotiated with the Purchasers to provide a bargained for rate of return on the Purchasers' investment in the Notes and is not a penalty.

Section 7.2(ii) of the SPA reads, in relevant part:

If any Event of Default ... shall exist, the Required Holders shall have the right to declare all the Notes then outstanding to be immediately due and payable in full at 100% of the outstanding principal amount thereof together with all interest accrued thereon and the Make Whole Amount, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.

*6 Section 7.2(iii) of the SPA reads, in relevant part:

Any Holder who or which shall not have consented to any waiver with respect to [certain] Event[s] of Default may, at its option, declare its Notes to be immediately due and payable in full at 100% of the outstanding principal amount thereof together with all interest accrued thereon and the Make Whole Amount, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.

Section 8.16(i) of the SPA states:

The Bank Loan Documents, Transaction Documents, the Financial Statements, and the certificates furnished to the Purchasers pursuant to *Section 3.1* do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading.

Section 12.11 of the SPA states:

THIS AGREEMENT IS TO BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS (WITHOUT GIVING EFFECT TO ANY LAWS OR RULES RELATING TO CONFLICTS OF LAWS THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE COMMONWEALTH OF MASSACHUSETTS).

Among the transaction documents that Clean Harbors executed and provided to John Hancock and the other purchasers in April 2001 were Clerk's Certificates, prepared by Davis, Malm, which state that the signature of Clean Harbors' Senior Vice President, Stephen H. Moynihan, to the SPA and related documents constitutes

conclusive evidence of [their] having been deemed necessary or appropriate and ratified and approved by these resolutions and the Company and of [their] binding effect on this Company.

On the same day that the Clean Harbors refinancing transaction was funded, each of Special Value, the Gates Foundation and Arrow filed notifications with the Office of the Massachusetts Attorney General pursuant to G.L.c. 271, Sec. 49(d) . These notifications were "hand-delivered to the Office of the Massachusetts Attorney General by Nicole L. Rives, Esq. of the law firm of Sullivan & Worcester, LLP, sometime in the mid-to-late afternoon of April 30, 2001." John Hancock and other purchasers previously had filed notifications with the Attorney General which, according to the provisions of G.L.c. 271, Sec. 49(d), remained in effect for two years after filing.

Just a few months after the closing of the Securities Purchase Agreement, an opportunity arose for Clean Harbors to buy the Chemical Services Division ("CSD") of Safety-Kleen, which by then had been in bankruptcy since June 2000. Apparently, Safety-Kleen could not effectuate a plan of reorganization because of its substantial environmental liabilities which took priority over its obligations to secured creditors. CSD had revenues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

**(Cite as: 2004 WL 616224 (Mass.Super.))**

of approximately $500 million.

For a substantial period of time CSD had been Clean Harbors' strongest competitor. Other strong competitors of Clean Harbors also exhibited interest in acquiring CSD. The basis for all parties' interest in CSD was that the winning bidder would likely become the leading provider of hazardous waste services in North America. The losers, in contrast, would find themselves in the unenviable position of lacking the ability to create higher operating margins and cash flow which the combination with CSD would create. The losers' inability to compete with the winner for crucial business would likely result in a substantial, and perhaps fatal, financial blow.

**\*7** Clean Harbors concluded, along with its experts, that it had to make a strong effort to acquire CSD or its very existence might be at stake.

After many months of effort, Clean Harbors was able to enter into an agreement to acquire CSD. This transaction, as finally structured, called for Clean Harbors to pay Safety-Kleen $46 million (eventually lowered to $34.2 million) plus assume $265 million of environmental liabilities. Because of the need to provide financial assurances in the event of closure of the facilities, Clean Harbor had to obtain $255 million in financing in order to close. The transaction was announced in February 2002, and Clean Harbors' stock price immediately went up approximately $4 to $15 per share.

The CSD acquisition would put Clean Harbors in technical default under the SPA and allow acceleration of the maturity of the Notes. As the closing of the CSD acquisition neared, Clean Harbors' lenders for its new financing indicated that they would not fund the transaction unless the situation with John Hancock and the other purchasers was resolved.

Clean Harbors signed the closing documents for the purchase of CSD on September 6, 2002. As a result of the CSD purchase, pursuant to Section 5.1(vi) of the SPA, also on September 6, 2002, Clean Harbors was obligated to, and did, provide

John Hancock and the other purchasers with an Officers' Certificate notifying them that Clean Harbors was then in default of its Negative Covenants 6.1, 6.2, 6.3, 6.4, 6.8 and 6.10 (relating to assumption of additional indebtedness, additional liens, additional guarantees, entry into acquisitions, restrictive agreements, and default as to certain financial covenants), all of which constituted an Event of Default under the SPA.

On September 9, 2002, the Note holders delivered notice to Clean Harbors pursuant to Section 7.2(ii) of the SPA demanding payment of the Notes, accrued interest, and the Make Whole Amount.

On September 10, 2002, Clean Harbors paid the Notes and accrued interest. It also paid the $16,991,129.44 Make Whole Amount, under protest. The protest letter stated:

As you know, the Company is of the view that the Make Whole Amount, of which your clients are demanding payment, is unreasonable, irrational and unconscionable and that it is an unenforceable penalty. Accordingly, while the Company will pay the Make Whole Amount, it reserves all of its rights with respect thereto, including its right to seek full reimbursement of the Make Whole Amount from your clients. The Company waives none of its rights or remedies.

The foregoing background sets the stage for the present summary judgment motions.

### DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. *Lindsay v. Romano,* 427 Mass. 771, 773 (1998); *Hakim v. Massachusetts Insurers' Insolvency Fund,* 424 Mass. 275, 283 (1997); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989).

**\*8** In assessment of the principal legal issues presented by the cross-motions, the Court feels

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

Page 7

somewhat like Odysseus in the *Odyssey,* passing between Scylla and Charybdis. The law is stated in two relatively innocuous cases: *A-Z Servicenter, Inc. v. Segall,* 334 Mass. 672 (1956), and *Renda v. Gouchberg,* 4 Mass.App.Ct. 786 (1976).

*A-Z Servicenter* involved a prepayment provision in connection with a mortgage note for $20,000 on a gasoline filling station. The SJC, at p. 675, stated the law in that case as follows:

Whether a provision of a contract for the payment of a sum upon breach is rendered unenforceable by reason of being a penalty depends upon the circumstances of each case ... Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced ... But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages ... The words "liquidated damages and not as a penalty" in the instant note is not decisive.

At p. 676, the SJC went on to say:

An acceleration clause advancing the maturity of the principal upon a breach of a mortgage note at the option of the holder is a common provision and has been held legal and binding in this Commonwealth ... This would also be true as to interest if the acceleration extended no further than to include the interest actually due at the time of the breach ... We think the judge was right in ruling that the acceleration provision in the note constituted a penalty.

*Renda* is a single-paragraph rescript opinion from the Appeals Court coming just a few months short of 20 years after *A-Z Servicenter.* It too involved a prepayment provision in connection with a mortgage note. Somewhat cryptically, the Appeals Court ruled:

Assuming, as we must on this record, that the underlying obligation is enforceable, the prepayment provision is not void as a penalty. Unlike the acceleration clause in *A-Z Servicenter, Inc. v. Segall,* 334 Mass. 672 (1956), the interest

required to be paid bears a "rational relation" (*id.* at 676) to the defendants' actual damages on prepayment, merely securing to the defendants the "benefit of [their] bargain" with the plaintiffs ... Because the defendant ... was not required by law to permit prepayment ... and because the plaintiffs' prepayment constituted a voluntary election on their part, cases concerning penalties payable as "liquidated damages" in the event of breach ... are inapposite.

Judge Botsford, in *Dellorfano v. The New England,* No. 88-3616, at 5 n. 3 (Mass.Super.Ct., July 19, 1990), stated that the legal distinction between voluntary and involuntary prepayments

*9 stem[s] from the fact that, when prepayment is voluntary, no breach of contract has occurred; there is thus no theoretical justification for scrutinizing the premium as a form of damages. Instead, it seems more appropriate that the prepayment premium be viewed as a bargained for fee that is tendered in exchange for the privilege of paying the debt early.

This Court agrees.

In the case before this Court, it must be decided upon the undisputed record whether this is a situation of the application of an acceleration provision, and if so whether it constitutes a penalty, or whether this is the enforcement of a prepayment provision securing to the lenders the benefit of their bargain in the face of a voluntary election to prepay by Clean Harbors.

The Court starts on September 6, 2002. That was the date that Clean Harbors signed the closing documents for the purchase of Safety-Kleen's CSD. Although market forces made this a highly desirable acquisition by Clean Harbors, John Hancock and the other purchasers of the Notes had absolutely nothing to do with those market forces. This action by Clean Harbors cannot be seen, as a matter of fact or law, as other than a voluntary election which had the effect of putting Clean Harbors in default of its obligations under the SPA. Indeed, Clean Harbors recognized that situation when, on that same day, pursuant to Section 5.1(vi) of the SPA, it provided John Hancock and the other purchasers with an Officers' Certificate notifying them that it was in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

(Cite as: 2004 WL 616224 (Mass.Super.))

Page 8

default of its Negative Covenants 6.1, 6.2, 6.3, 6.4, 6.8 and 6.10.

The Officers' Certificate did more than just comply with the reporting requirements of Section 5.1(vi) of the SPA. It revealed, in Clean Harbors' own words, that it was bound to close the CSD acquisition. The words used in the Officers' Certificate, after reporting on the defaults, read as follows:

said Defaults constitute an Event of Default under Section 7.1(v) of the Agreement;

Said Defaults and Event of Default have been extant since September 6, 2002; and

The Company has not taken is not taking and does not propose to take any action with respect to said Defaults and Event of Default.

By stating that the defaults "have been extant since September 6, 2002," Cleans Harbors has conceded that: as of that date it had incurred or assumed impermissible debt (SPA Sec. 6.1); it had incurred, assumed or permitted impermissible liens on its property (SPA Sec. 6.2); it had incurred impermissible contingent liabilities (SPA Sec. 6.3); it had entered into an impermissible transaction to acquire a business out of the ordinary course of its business (SPA Sec. 6.4); it had entered into an impermissible agreement or arrangement containing restrictive covenants (SPA Sec.6.8); and it was in violation of certain financial covenants (6.10). All of this only could have occurred through the binding entry into the acquisition of CSD and the financing therefor, all as of September 6, 2002.

*10 As alleged by Clean Harbors in Paragraph 35 of its complaint, "Clean Harbors' lenders for its new financing [for the CSD acquisition] indicated that they would not fund the transaction unless the situation with John Hancock was resolved." This allegation is binding on Clean Harbors. See G.L.c. 231, Sec. 87. The "situation with John Hancock," of course, involved the rights of John Hancock and the other purchasers under the SPA, including the prepayment provisions and the Make Whole Amount. As noted above, on September 10, 2002, Clean Harbors paid the Notes and accrued interest. It also paid the $16,991,129.44 Make Whole Amount, albeit the latter was under protest. These

payments were either voluntary on Clean Harbors' part or required by its new lenders in connection with the CSD acquisition and financing. Again, John Hancock and the other purchasers of the Notes were not involved in the CSD acquisition or its financing.

Between September 6, 2002, the date that Clean Harbors' obligations in the CSD transaction became "extant," and September 10, 2002, when it paid the Make Whole Amount, on September 9, 2002, John Hancock and the other purchasers delivered notice to Clean Harbors pursuant to Section 7.2(ii) of the SPA demanding payment of the Notes, accrued interest, and the Make Whole Amount.

Before stating its conclusions, this Court pauses to observe that all parties in this case are extremely sophisticated, all had the constant advice and assistance from highly competent counsel, and Clean Harbors, in particular, operated with the advice and guidance of Deutsche Bank in the transaction that led to the SPA, including the prepayment and Make Whole Amount provisions contained therein. This sophisticated group negotiated and chose specific language for its transaction. Here--perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at hand--where knowledgeable and fully represented parties chose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the language they chose.

The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instruments that are specifically anticipated and addressed therein overwhelm or change the documents themselves. "[A]greements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so." *Freedman v. Walsh,* 331 Mass. 401, 406 (1954). No special circumstances have been demonstrated here. It is not the role of the Court to alter the parties' agreement. "Even if it be found that the contract, according to its true meaning ... fails to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 9

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

**(Cite as: 2004 WL 616224 (Mass.Super.))**

become operative, it is not for the [C]ourt, in order to give it operation, to suppose a meaning which the parties have not expressed ..." *Shoe & Leather Nat'l Bank v. Dix,* 123 Mass. 148, 150 (1877). In short, this is not the time for the Court to attempt to be smarter than the parties.

*11 Clean Harbors knew full well what it was getting into when it became a party to the SPA in April of 2001. It fully understood the Make Whole Amount and the prepayment provisions. Indeed, its financial consultant, Deutsche Bank, went so far as to run the numbers on potential Make Whole Amounts and, thereafter, recommended the SPA to Clean Harbors.

At least Deutsche Bank, and probably Clean Harbors, by at least sometime in 2002 before the closing on the CSD acquisition, was aware that the Make Whole Amount could be in the range of $14.35 million and, as actually paid, turned out to be $16.99 million, which was a variation of only 18.1%.

Clean Harbors also knew, full well, what it was getting into in connection with the Safety-Kleen CSD acquisition, both with regard to the requirements of its new lenders and the obligations to John Hancock and the other purchasers under the SPA. It made its choice with its eyes wide open. And it did so for reasons that seemed highly beneficial for Clean Harbors. [FN2]

> FN2. Clean Harbors, in a Press Release dated September 11, 2002, provided as part of its counsel's affidavit, extols the benefits of the CSD acquisition. Included is the statement: "As a result of the acquisition, Clean Harbors will be on a run rate to achieve annualized revenues of approximately $750 million ..."

The Make Whole Amount is not a penalty payable as liquidated damages in the event of a breach. Rather, it is a payment that came about as a result of Clean Harbors' voluntary election to put itself in a position whereby it prepaid the Notes to facilitate the CSD acquisition. The "liquidated damages"

analysis in *A-Z Servicenter* does not apply here. The Make Whole Amount was, instead, a bargained for fee paid in exchange for the privilege of paying a debt early.

The September 9, 2002, "acceleration" by John Hancock and the other purchasers does not change the situation. By then, Clean Harbors had already bound itself, voluntarily, to go forward with the CSD acquisition and the prepayment of the PSA debt required by its new lenders.

Nor is there any gross disproportionate number between the actual Make Whole Amount of $16.9 million paid and the $14.35 million calculated by Deutsche Bank before Clean Harbors entered into the PSA in April of 2001. Only the circumstances that existed at the time of the contract formation matter on the issue of the enforceability of a liquidated damages clause. See *Kelly v. Marx,* 428 Mass. 877, 880 (1999). Thus, even if this situation were treated under an *A-Z Servicenter* analysis, there can be no finding of a "grossly disproportionate" amount on the facts presented.

Clean Harbors makes an argument as to some, but not all, defendants predicated on the requirements of G.L.c. 271, Sec. 49, the criminal usury statute. Subpart (d) to Sec. 49 contains a safe harbor provision that reads, in relevant part, as follows:
> The provisions of paragraph (a) to (c), inclusive, shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a) providing any such person maintains records of any such transactions. Such notification shall be valid for a two-year period and shall contain the person's name and accurate address ... Such records shall contain the name and address of the borrower, the date the loan is made and the date or dates on which any payment is due ...

*12 In this matter, all purchasers of the Notes, except for Special Value, the Gates Foundation and Arrow, filed notifications with the Office of the Massachusetts Attorney General pursuant to G.L.c.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

**(Cite as: 2004 WL 616224 (Mass.Super.))**

271, Sec. 49(d) prior to April 30, 2001, and their notices were within the two-year requirement.

The notifications of Special Value, the Gates Foundation and Arrow were "hand-delivered to the Office of the Massachusetts Attorney General by Nicole L. Rives, Esq. of the law firm of Sullivan & Worcester, LLP, sometime in the mid-to-late afternoon of April 30, 2001." At Clean Harbors' request, Special Value, the Gates Foundation and Arrow wired their respective shares of the funding amount to Clean Harbors' bank early in the day on April 30, 2001, so that Clean Harbors could meet an 11:00 a.m. deadline for the repayment of its Outstanding Indebtedness. Consequently, their notices were received by the Attorney General's Office on the same day that the loans were made, but physically arrived there two or three hours later in the day.

G.L.c. 277, Sec. 49 is a criminal statute and, as such, must be strictly construed. See *Hakim Enterprises, Inc. v. Reinhardt,* 30 Mass.App.Ct. 911 (1991). In reaching its decision in *Hakim,* the Appeals Court expressly noted and followed

the ordinary rule of construction that any criminal statute is construed strictly against the Commonwealth. Any reasonable doubt as to the meaning of a criminal statute must be resolved in favor of a defendant, that is, against finding a criminal violation.

*Id.* at 30 Mass.App.Ct. 911-12.

Further, here, given that the reason for the slight delay in filing the notice with the Attorney General by Special Value, the Gates Foundation and Arrow was solely the result of accommodating Clean Harbors' morning satisfaction of its pay-off of its Outstanding Indebtedness, there is no reason to find fault with the filings of the notice to the Attorney General a few hours after funding the loan. Indeed, the statute itself makes no provision as to when the notice must be filed. It speaks in a contradicting fashion of including the "intent" to make the loan--which sounds like something that precedes the transaction--and including "the date the loan is made and the date or dates on which any payment is due"--which often, indeed generally, is not known

until the day of the transaction.

On the foregoing background and discussion of the summary judgment motions, no mention is made of the defendants Hare & Company, Blazerman & Co., and Coastledge & Co. They were not parties to the PSA and cannot be sued for a breach thereof. *Palmer Sav. Bank v. Insurance Co. of North America,* 166 Mass. 189, 195-96 (1896). These defendants were merely holders or custodians of the subordinated notes issued by Clean Harbors for the benefit of the other defendants. They have no independent stake in the outcome of this litigation and Clean Harbors can recover nothing from them.

The foregoing discussion resolves this Court's consideration of the cross-motions for summary judgment. The Court now turns, briefly, to the remaining ancillary motions.

*Defendants' Motion to Impound Exhibits to Summary Judgment Submission (Paper # 48) and Clean Harbors, Inc.'s Motion to Impound Exhibit Binders (Paper # 52)*

*13 By these two motions the parties seek to have impounded certain documents submitted in support of and in response to the defendants' motion for summary judgment. In a Memorandum and Order dated July 21, 2003, in this case, this Court expressed its serious reservations about the impoundment of matters presented in civil proceedings in a public court. It has examined the matters now sought to be granted secrecy protection and has considered the nature of the parties and the controversy, the type of information and the claimed privacy interests involved, the extent of community interest, and the reasons for the requests. All things considered, this Court is not convinced that impoundment is warranted and both motions will be denied.

*Clean Harbors, Inc.'s Emergency Motion to Strike Defendant-Lenders' Post- Hearing Affidavit (Paper # 11)*

This motion seeks to have stricken the Affidavit of Brian A. Davis and Appendix to Defendants' Reply Memorandum in Support of Summary Judgment. The affidavit challenged was filed the day after oral

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 11

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

**(Cite as: 2004 WL 616224 (Mass.Super.))**

argument on the cross-motions for summary judgment.

This Court has been buried in a huge mass of papers by both sides. Its "Background" section above reveals those facts that the Court, from the multiple Rule 9A(b)(5) statements and the complaint filed, found to be not in dispute for purposes of the motions under consideration. This Court is not now going to pore over the various filings supporting the Rule 9A(b)(5) statements to determine from which, if not more than one, source the facts were determined.

This motion will be denied.

*Clean Harbors, Inc.'s Motion in Limine and to Strike (Paper # 49)*

By this motion, Clean Harbors asks the Court to strike portions of the defendants' summary judgment materials and to preclude them front offering evidence or argument at trial as to matters they prevented Clean Harbors from discovering by invoking the attorney/client privilege. What is at stake apparently is whether certain witnesses, on attorney/client privilege grounds, declined to testify as to the "reasons and motivations for ... [the] decision on September 9, 2002 to accelerate the maturity of Clean Harbors' ... debt and demand that Clean Harbors pay the notes as well as a $16,991,129.44 'Make Whole Amount.' "

This Court, in deciding the summary judgment motions, did not consider the reasons for the actions of any of the sophisticated parties involved in this case. It focused on what was said in their agreement and what they did, not the reasons for what they did. As a motion to strike, this motion will be denied. Whether it ever will have legs as a motion in limine depends heavily upon whether this case ever goes to trial. Given the ruling on the motions for summary judgment, it is not now headed in that direction.

*Clean Harbors, Inc.'s Motion to Strike Summary Judgment Materials Submitted by the Defendant-Lenders (Paper # 50)*

For the reasons applied to the previous two motions, this motion also will be denied.

*ORDERS*

**\*14** 1. Defendants' Motion for Summary Judgment (Paper # 46) is *ALLOWED;*
2. Clean Harbors, Inc.'s Motion for Partial Summary Judgment (Paper # 54) is *DENIED;*
3. Clean Harbors, Inc.'s Emergency Motion to Strike Defendant-Lenders' Post-Hearing Affidavit (Paper # 11) is *DENIED;*
4. Defendants' Motion to Impound Exhibits to Summary Judgment Submissions (Paper # 48) is *DENIED;*
5. Clean Harbors, Inc.'s Motion In Limine and To Strike (Paper # 49), treated as a motion to strike only, is *DENIED;*
6. Clean Harbors, Inc.'s Motion to Strike Summary Judgment Materials Submitted by the Defendant-Lenders (Paper # 50) is *DENIED;* and
7. Clean Harbors, Inc.'s Motion to Impound Exhibit Binders (Paper # 52) is *DENIED.*
An appropriate final judgment shall enter accordingly

17 Mass.L.Rptr. 468, 2004 WL 616224 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

Not Reported in N.E.2d                                                                 Page 1

2 Mass.L.Rptr. 493, 1994 WL 879712 (Mass.Super.)

**(Cite as: 1994 WL 879712 (Mass.Super.))**

Superior Court of Massachusetts.
Philip **SHWACHMAN**, [FN1]

FN1. In his capacity as trustee of the New Seven Hills Trust, also known as the Madison Plaza Trust.

v.

DAVIS RADIO CORPORATION and Others.
[FN2]

FN2. Davis Advertising, Inc. (also known as Leonard Davis Advertising, Inc.) and Jeffrey M. Davis and Andrew R. Davis, individually and in their capacity as principals of Davis Advertising, Inc.

No. 9301912A.

July, 1994.

LENK, J.

*1 This case arises from a landlord-tenant dispute concerning two separate commercial spaces located at 60-90 Madison Street in Worcester, Massachusetts. The plaintiff Philip Shwachman ("Shwachman") commenced the present action against the defendants Davis Radio Corporation ("Davis Radio") and Davis Advertising, Inc. ("Davis Advertising") alleging breach of the rental agreements, property damage, and unfair and deceptive acts in violation of G.L.c. 93A (Counts I and IV). In addition, Shwachman seeks to recover against Jeffrey Davis and Andrew Davis, [FN3] in their capacity as guarantors of the leases, for breach of the rental agreements and for violations of G.L.c. 93A (Counts II, III, V, and VI). Shwachman now brings this motion for summary judgment on all counts pursuant to Mass.R.Civ.P. 56. In opposition, the defendants assert that they were constructively evicted from the leased premises, and accordingly summary judgment is inappropriate.

FN3. See *supra* note 2.

BACKGROUND

The following facts are undisputed. [FN4] On July 7, 1988, Davis Advertising signed a five-year lease with Shwachman for the rental of commercial space located at 60-90 Madison Street in Worcester, Massachusetts. Commencing on November 1, 1988 and terminating on October 31, 1993, the lease contained provisions for rent, [FN5] utilities, [FN6] conditions of default, [FN7] and parking places. [FN8] Davis Advertising entered the leased premises at the commencement of the rental period without incident and began to operate its advertising agency. On September 18, 1990, Davis Radio signed a three-year lease with Shwachman for the rental of commercial property located at 90 Madison Street in Worcester, Massachusetts. Commencing on November 1, 1990 and terminating on October 31, 1993, this lease had similar provisions as the Davis Advertising lease regarding lessor obligations and conditions of default. The Davis Radio lease differed, however, with respect to rent, [FN9] utilities, [FN10] and parking spaces. [FN11] Davis Radio also moved into the rental property at the inception of its lease term without incident and used the location to operate "WORC," a radio station which broadcasts twenty-four hours a day.

FN4. Shwachman concedes the defendants' allegations for purposes of this motion.

FN5. The lease provided for rental payments at the rate of twenty-eight hundred seventy-five dollars ($2,875) per month. Lease Agreement C, para. 4.

FN6. Shwachman agreed to "furnish and pay for reasonable heat and air conditioning to the leased premises and lavatories during normal business hours on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

2 Mass.L.Rptr. 493, 1994 WL 879712 (Mass.Super.)

(Cite as: 1994 WL 879712 (Mass.Super.))

Page 2

regular business days ..." Lease Agreement C, para. 7.

FN7. In the event of default by the lessee, the lessor had the right:
to re-enter and take complete possession of the leased premises, to declare the term of this lease ended, to remove the Lessee's effects, without prejudice ... Lessee shall indemnify the Lessor against all loss of rent and other payment which the Lessor may incur by reason of such termination during the residue of the term.
Lease Agreement C, para. 19(a).

FN8. An addendum to the rental agreement entitled Davis Advertising to nine free parking permits at Madison Place (located across the street from the rental premises) or at another location within one thousand feet of the rented premises.

FN9. The lease provided for a monthly rent of seven hundred twenty-five dollars ($725). Lease Agreement A, para. 4.

FN10. The utility provision provided, in pertinent part: the lessor agrees to provide utility service and to furnish reasonably hot and cold water and reasonable heat and air conditioning to the leased premises and lavatories during normal business hours on regular business days of the heating and air conditioning* seasons of each year.
*Normal business hours are 8 A.M. to 6 P.M. weekdays and Saturdays 8 A.M. to 1 P.M.
Lease Agreement A, para. 7.

FN11. Davis Radio is entitled to three free parking permits for the Lessor's parking lot, located at 160 Southbridge Street. See Addendum, Lease Agreement A.

In January of 1992, Shwachman leased space above Davis Advertising to the Pampered Pet Dog Grooming Shop ("Pampered Pet"). Subsequently, Davis Radio and Davis Advertising complained

orally to Shwachman on several occasions regarding the smell from Pampered Pet which had caused several employees to become ill. [FN12] Davis Advertising contends the premises became uninhabitable due to the odor, noise, and general unsanitary conditions emanating from Pampered Pet.

FN12. Davis Advertising claims the odor from Pampered Pet was so oppressive that one of Davis Radio's employee's threatened to quit work because she feared the smell would have a deleterious effect on her pregnancy.

Davis Radio and Davis Advertising also complained to Shwachman concerning the lack of proper heat and air conditioning, ineffective magnetic locks, insufficient security in the parking area, [FN13] violations of the parking agreement, and property damage caused by a water leak which destroyed two computers, work papers, and bookkeeping records. The attorney for both Davis Radio and Davis Advertising sent to Shwachman a letter dated December 7, 1992, complaining of the lack of heat. Davis Radio contends that these incidents caused significant disruption to its program operations resulting in a loss of revenue and jeopardizing its "FCC licenses." [FN14] Aff. Andrew Davis, para. 3(d). As a result of these conditions, Davis Radio and Davis Advertising vacated their respective rental premises in March 1993, claiming constructive eviction.

FN13. Another employee quit working for Davis Radio after two assaults en route to the parking lot.

FN14. The FCC requires that the station stay in operation twenty-four hours a day. Aff. Andrew Davis, para. 3(d).

DISCUSSION

*2 Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

2 Mass.L.Rptr. 493, 1994 WL 879712 (Mass.Super.)

(Cite as: 1994 WL 879712 (Mass.Super.))

Page 3

*Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue "and [further,] that the moving party is entitled to judgment as a matter of law." *Pederson v. Time, Inc.* 404 Mass. 14, 16-17 (1989).

Originally at common law, a lease agreement created a property relationship between the landlord and tenant. See *Boston Housing Auth. v. Hemingway,* 363 Mass. 184, 198 (1973) (discussing evolution of landlord-tenant law). Today, however, the landlord-tenant relationship is viewed as contractual in nature wherein the landlord promises to deliver and maintain the premises in a habitable condition and the tenant promises to pay rent for the use thereof. See *id.* at 198-99 (discussing contractual nature of landlord-tenant relationship). While a warranty of habitability is implied in residential leases, [FN15] "no such warranty may be implied in the rental of commercial property." *Buker v. National Management Corp.,* 16 Mass.App.Ct. 36, 41, *appeal denied,* 389 Mass. 1104 (1983). See *Boston Housing Auth. v. Hemingway,* 363 Mass 184, 198 (1973) (warranty of habitability implied in residential leases); *Gade v. National Creamery Co.,* 324 Mass. 515, 518-19 (1949) (distinguishing warranty of habitability in residential leases as the exception). Although the lessor may expressly warrant for the habitability of commercial property, there is no evidence proffered by either party of such a warranty. *Buker v. National Management Corp.,* 16 Mass.App.Ct. 36, 42, *appeal denied,* 389 Mass. 1104 (1983). Accordingly, the defendants cannot rely on a breach of warranty of habitability as the reason for their departure. [FN16]

> FN15. Nevertheless, the general rule is that covenants in leases are independent, absent a clear indication to the contrary. *Barry v. Frankini,* 287 Mass. 196, 201 (1934); *Sniger v. Fentin,* 4 Mass.App.Ct. 215, 217 (1976).
>
> FN16. Although Shwachman correctly

states that no warranty of habitability is implied in commercial leases, see discussion *supra,* the defendants have not asserted such a defense. Rather, the defendants' sole defense is grounded upon the doctrine of constructive eviction as discussed below.

An implied covenant of quiet enjoyment exists in every lease. E.g. *Blackett v. Olanoff,* 371 Mass. 714, 714-15 (1977); *Dyecraftsman, Inc. v. Feinberg,* 358 Mass. 485, 489 (1971); *Winchester v. O'Brien,* 266 Mass. 33, 36 (1929). "The implied covenant is a promise that, during the term of his tenancy, the tenant shall not be disturbed in the enjoyment of the premises by the lessor or anyone claiming under him or by anyone claiming paramount title." *Rahman v. Federal Management Co.,* 23 Mass.App.Ct. 701, 705, *rev. denied,* 400 Mass. 1102 (1987). Where there is a breach by the landlord of the covenant of quiet enjoyment, the tenant may raise the defense of constructive eviction. *Charles E. Burt, Inc. v. Seven Grand Corp.,* 340 Mass. 124, 127 (1959). Constructive eviction is also a defense for the nonpayment of rent. *Boston Housing Auth. v. Hemingway,* 363 Mass 184, 202- 03 (1973). The burden of proving constructive eviction lies with the tenant. *Rome v. Johnson,* 274 Mass. 444, 450 (1931).

*3 Not every act done by the landlord constitutes constructive eviction. *Tracy v. Long,* 295 Mass. 201, 204 (1936). For instance, conduct which is "slight or temporary in effect" does not entitle the tenant to abandon the premises. See *id.* (single act of disconnection of water pipe for three or four days not permanent or substantial). Rather, to constitute constructive eviction, "there must be some act of permanent character done by the landlord with the intent and effect of depriving the tenant of enjoyment of the premises or some part thereof, to which the tenant yields, abandoning the premises within a reasonable time." *Id.* at 203. See *Charles E. Burt, Inc. v. Seven Grand Corp.,* 340 Mass. 124, 127 (1959) (tenant successfully proved constructive eviction where landlord failed to provide light, heat, power, and elevator service); *Westland Housing Corp. v. Scott,* 312 Mass. 375, 381 (1942)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 4

2 Mass.L.Rptr. 493, 1994 WL 879712 (Mass.Super.)

(Cite as: 1994 WL 879712 (Mass.Super.))

(constructive eviction where soot and smoke caused by oil burner persisted for a period of time); *Winchester v. O'Brien*, 266 Mass. 33, 36 (1929) (remodeling of building by landlord caused excessive noise, precluded tenant's access, and interfered with tenant's business amounting to a constructive eviction). The landlord's conduct is controlling; the law assumes that he intends the "natural and probable consequences of what the [he] did, what he failed to do, or what he permitted to be done." *Blackett v. Olanoff*, 371 Mass. 714, 716 (1977).

In the instant case, the submissions by the defendants indicate an ongoing disruption caused by Pampered Pet. Whether the smell was so oppressive as to constitute constructive eviction is an issue for the jury. Accordingly, the defendants have made a colorable claim for constructive eviction.

Shwachman contends, however, that the defendants failed to vacate the leased premises within a reasonable time of the alleged breach. In opposition, the defendants claim they vacated the premises in a reasonable time after repeated oral complaints concerning lock-outs, heat and air conditioning disruptions, and the odor emanating from Pampered Pet which rendered the premises uninhabitable.

Whether a tenant vacates the premises within a reasonable time is generally a question of fact. *Palumbo v. Olympia Theaters, Inc.*, 276 Mass. 84, 88 (1931); *Rome v. Johnson*, 274 Mass. 444, 450-51 (1931); *DeWitt v. Pierson*, 112 Mass. 8, 11 (1873). But see *A.W. Banister Co. v. P.J.W. Moodie Lumber Corp.*, 286 Mass. 424, 426-27 (1934) (tenant unsuccessful where he remained in premises despite landlord's breach); *Palumbo v. Olympia Theaters, Inc.*, 276 Mass. 84, 88 (1931) (tenant remained in possession for eleven months after complaint found not reasonable time). A reasonable time "depends upon the circumstances of each case including the size of the leased premises, the purposes for which they are occupied by the tenant, ... and the difficulty of securing another location suitable for the conduct of the [ ] business."

*Rome v. Johnson*, 274 Mass. 444, 451 (1931). Where, as here, the timeliness of the defendants' departure raises a factual issue, its resolution is properly left for a jury.

*4 Because Shwachman's claims under G.L.c. 93A directly relate to the defendants' conduct in abandoning the premises, they cannot be properly resolved at this time. Additionally, Shwachman's failure to proffer any evidence supporting his claim for property damage is fatal to his motion for summary judgment. See *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17 (1989) (moving party must affirmatively demonstrate the lack of triable issue under Mass.R.Civ.P. 56).

ORDER

For the foregoing reasons, the plaintiff's motion for summary judgment is DENIED.

2    Mass.L.Rptr.    493,    1994    WL    879712 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

2001 Mass.App.Div. 88

Page 1

2001 Mass.App.Div. 88, 2001 WL 589070 (Mass.App.Div.)

**(Cite as: 2001 WL 589070 (Mass.App.Div.))**

C

Massachusetts Appellate Division, District Court
Department, Northern District.
Richard ALBRIGHT
v.
TRUSTEES OF THE VILLA GRANDE
CONDOMINIUM and another. [FN1]

FN1. Charles James Associates, Inc.

No. 9707.

Heard March 21, 2000.
Opinion Certified May 24, 2001.

West Headnotes

**[1] Consumer Protection ⚮6**
92Hk6 Most Cited Cases
Trustees of condominium complex and its
managing agent were not engaged in "trade" or
"commerce" as contemplated by unfair and
deceptive business practices statute and, thus, could
not be liable to unit owner under those statutes;
relationships between trustees and unit owner, and
between agent and unit owner, were of a private
nature and outside scope of statute. M.G.L.A. c.
93A, § 2.

**[2] Consumer Protection ⚮5**
92Hk5 Most Cited Cases

**[2] Trade Regulation ⚮862.1**
382k862.1 Most Cited Cases
Whether parties to a transaction are engaged in
"trade" or "commerce" as contemplated by unfair
and deceptive business practices statute depends
upon the following factors: (1) the nature of the
transaction, (2) the character of the parties, (3) the
activities participated in, and (4) whether the
transaction was motivated by business or personal
reasons. M.G.L.A. c. 93A, § 2.

**[3] Consumer Protection ⚮5**
92Hk5 Most Cited Cases

**[3] Trade Regulation ⚮862.1**
382k862.1 Most Cited Cases
Transactions that are private in nature do not entail
liability under the unfair and deceptive business
practices statute. M.G.L.A. c. 93A, § 2.

**[4] Consumer Protection ⚮5**
92Hk5 Most Cited Cases

**[4] Trade Regulation ⚮862.1**
382k862.1 Most Cited Cases
The unfair or deceptive acts or practices prohibited
by statute are those that may arise in dealings
between discrete, independent business entities, and
not those that may occur within a single company.
M.G.L.A. c. 93A, § 2.

**[5] Condominium ⚮12**
89Ak12 Most Cited Cases
Condominium trustees and their managing agents
have an obligation imposed by the condominium
master deed to collect payment for common
assessments and obligations.

**[6] Consumer Protection ⚮10**
92Hk10 Most Cited Cases
Attorney General's regulations governing debt
collection practices did not apply to relationship
between condominium unit owner and the trustees
of condominium complex and its managing agent,
where there was no lease or loan between the
parties, and assessment imposed on unit owner for
an improvement was not for owner's individual
benefit, or for his personal, family or household
purposes, as required by regulation's definition of
"debt." Mass.Regs. Code title 40, §§ 7.00 et seq.,
7.03.

**[7] Process ⚮171**
313k171 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 Mass.App.Div. 88

2001 Mass.App.Div. 88, 2001 WL 589070 (Mass.App.Div.)

**(Cite as: 2001 WL 589070 (Mass.App.Div.))**

Condominium unit owner's allegations that trustees of condominium complex initiated civil action against him for ulterior purpose of coercing him into selling his unit and that he was damaged thereby were sufficient to state a cause of action against trustees for abuse of process.

**[8] Process ☞168**

313k168 Most Cited Cases

To constitute a cause of action for abuse of process, it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.

**[9] Pretrial Procedure ☞622**

307Ak622 Most Cited Cases

Doubt or misgivings whether a claim can be ranked as provable or even credible is not a proper basis for dismissal of the plaintiff's action for failure to state a claim. Rules Civ.Proc., Rule 12(b)(6), 43A M.G.L.A.

Alan S. Fanger, Needham, MA, for Plaintiff.

Mary Lou Mûirehead, Marcus, Errico, Emmer & Brooks, Braintree, MA, for Defendants.

COVEN, J.

*1 This is an action against the trustees of a condominium complex and its managing agent for their alleged unfair debt collection practices in violation of G.L. c. 93A and for abuse of process.

Plaintiff Richard Albright ("Albright") filed his complaint against the Trustees of the Villa Grande Condominium ("Trustees"), the condominium development in which he was a unit owner, and Charles James Associates, Inc. ("CJA"), the managing agent for the Trustees. Albright sought damages against both defendants for their alleged defamation and G.L. c. 93A violations, and included an additional claim against the Trustees for their alleged abuse of process. The defamation count was dismissed with prejudice by agreement of the parties. Both defendants filed Mass. R. Civ. P. 12(b)(6) motions to dismiss the remaining counts.

The motions were allowed, and Albright filed this Dist./ Mun. Cts. R.A.D.A. 8C appeal.

When evaluating the Rule 12(b)(6) sufficiency of a complaint, the court accepts all allegations as true and draws all rational inferences in the plaintiff's favor. *Ginther v. Commissioner of Ins.*, 427 Mass. 319, 322, 693 N.E.2d 153 (1998); *Cacciola v. Nellhaus*, 49 Mass.App.Ct. 746, 755, 733 N.E.2d 133 (2000). A complaint may not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief, *General Motors Acceptance Corp. v. Abington Cas. Ins. Co.*, 413 Mass. 583, 584, 602 N.E.2d 1085 (1992), under any theory of law. *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 89, 390 N.E.2d 243 (1979); *Wrightson v. Spaulding*, 20 Mass.App.Ct. 70, 71, 478 N.E.2d 141 (1985).

1. Viewed most favorably to Albright, the complaint alleges the following facts relative to his G.L. c. 93A claim: Albright is a unit owner in the Villa Grande Condominium, and the Trustees delegated the management of the Condominium to CJA. In the performance of its management role, CJA assessed Albright for damage to carpeting inside the condominium building. Albright claims that any damage to the carpeting was not the result of any misfeasance on his part, and that the assessment charges were not only unreasonable, but also fabricated and invented. The issue presented by Albright's appeal is thus whether the allegations of improper billing of a unit owner by the managing agent of a condominium trust states a cause of action against the agent and the trust under G.L. c. 93A.

[1][2] Both parties acknowledge that central to the determination of whether G.L. c. 93A is applicable in the circumstances of this case is the resolution of the foundation question of whether the defendants were engaged in "trade" or "commerce." Section 2 of G.L. c. 93A provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Whether parties to a transaction are engaged in trade or commerce

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 Mass.App.Div. 88

2001 Mass.App.Div. 88, 2001 WL 589070 (Mass.App.Div.)

**(Cite as: 2001 WL 589070 (Mass.App.Div.))**

Page 3

depends upon the following factors: "(1) the nature of the transaction, (2) the character of the parties, (3) the activities participated in, and (4) whether the transaction was motivated by business or personal reasons." *Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.,* 398 Mass. 480, 491, 498 N.E.2d 1044 (1986).

*2 [3][4] The character of the parties is critical in this case. Transactions that are private in nature do not entail G.L. c. 93A liability. *Lantner v. Carson,* 374 Mass. 606, 607-608, 373 N.E.2d 973 (1978). Thus G.L. c. 93A is inapplicable, for example, to disputes involving stockholders and corporations, *Riseman v. Orion Research, Inc.,* 394 Mass. 311, 313-314, 475 N.E.2d 398 (1985); employee and employer disputes, *Manning v. Zuckerman,* 388 Mass. 8, 14, 444 N.E.2d 1262 (1983); and disputes between partners involving partnership business. *Newton v. Moffie,* 13 Mass.App.Ct. 462, 469-470, 434 N.E.2d 656 (1982). "The development of c. 93A suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company." *Szalla v. Locke,* 421 Mass. 448, 451, 657 N.E.2d 1267 (1995).

We conclude that the relationship between the Trustees and Albright is one of a private nature and falls, therefore, outside the scope of G.L. c. 93A. The relationship between Albright and the Trustees as set forth in G.L. c. 183A is a function of the unique nature of condominium law in Massachusetts. *Cigal v. Leader Development Corp.,* 408 Mass. 212, 217-218, 557 N.E.2d 1119 (1990). Albright does not argue differently. He instead contends that CJA's actions subject it to an independent liability under G.L. c. 93A, and that the Trustees are then vicariously liable for CJA's misconduct. Cf. *Kansallis Finance Ltd. v. Fern,* 421 Mass. 659, 659 N.E.2d 731 (1996) (innocent partner may be vicariously liable for acts of another partner).

We disagree, concluding that CJA is not liable under G.L. c. 93A because it is not engaged in trade or commerce as those terms are used in the statute,

and that the Trustees are thus not vicariously liable. Section 10(c) of G.L. c. 183A authorizes the appointment of a managing agent, in this case CJA, to perform the duties incumbent upon the condominium association. Section 10(1) provides that "[s]uch manager or managing agent ... may ... act for the [condominium] and references herein to the organization of unit owners shall include such persons when so empowered." Therefore, as CJA stands in the shoes of the Trustees, Albright's relationship with CJA is exactly the same as his relationship with the Trustees; namely, private in nature and outside the scope of G.L. c. 93A.

[5][6] Further, there is no merit in Albright's contentions that CJA's assessment against him was analogous to a landlord collecting rent or a business collecting a debt for services rendered. Rather, condominium trustees and their managing agents have an obligation imposed by the condominium master deed to collect payment for common assessments and obligations. See *Blood v. Edgar's Inc.,* 36 Mass.App.Ct. 402, 407-408, 632 N.E.2d 419 (1994). Nor is the relationship between the parties governed by the Attorney General's regulations involving debt collection practices, 940 CMR 7.00 *et seq.,* because of the definition of "debt" set forth therein. Section 7.03 of 940 CMR defines a "debt" as "money ... due and owing ... as a result of a purchase, lease, or loan of ... services ... for personal, family or household purposes...." There was obviously no "lease or loan" in the present case. Nor was there a "purchase" which, as used in the regulations, contemplates a voluntary exchange of money or other valuable consideration for something used for "personal, family or household purposes." [FN2] In this case, an assessment was *imposed* on Albright for an improvement which was not for Albright's individual benefit, nor for his "personal, family or household purposes," but to an area shared in common with all other unit owners.

FN2. See Black's Law Dictionary 1248 (7th ed. 1999) ("Purchaser: 1. One who obtains property for money or other valuable consideration; a buyer.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 Mass.App.Div. 88

Page 4

2001 Mass.App.Div. 88, 2001 WL 589070 (Mass.App.Div.)

**(Cite as: 2001 WL 589070 (Mass.App.Div.))**

*3 Accordingly, there was no error in the allowance of the defendants' Rule 12(b)(6) motion to dismiss Albright's G.L. c. 93A claims.

[7][8][9] 2. We conclude that Albright's complaint does, however, state a cause of action for abuse of process.

"To constitute a cause of action for [abuse of process] it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed."

*Gabriel v. Borowy*, 324 Mass. 231, 236, 85 N.E.2d 435 (1949). The complaint alleges that the Trustees initiated a civil action against him for the ulterior purpose of coercing him into selling his unit and that he was damaged thereby. These allegations are sufficient to withstand a Rule 12(b)(6) challenge. While the defendants argue that the underlying facts show that the purpose of the complaint was legitimate in all respects, we are limited to an examination of only the complaint in reviewing a Rule 12(b)(6) order. Further, "[d]oubt or misgivings whether the present claim can be ranked as provable (or even credible) ... is not a proper basis for dismissal of the plaintiff's action under Rule 12(b)(6)." *Wrightson v. Spaulding, supra* at 72, 478 N.E.2d 141. If the defendants are of the belief that the underlying facts demonstrate that the "complaint lacks merit, the defendant[s] should take the appropriate steps to cause the matter to be brought within the purview of Rule 56(b), 365 Mass. 824 (1974)." *Id.*

The dismissal of the plaintiff's claim for abuse of process is reversed, and the case is returned to the trial court on that claim. The dismissal of the G.L. c. 93A counts is affirmed, and the appeal is dismissed.

So ordered.

2001 Mass.App.Div. 88, 2001 WL 589070 (Mass.App.Div.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.